# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

STEFANIE SMITH,                          )
                                         )
            Plaintiff,                   )
                                         )
      v.                                 )      Case No. 10-CV-4100-NKL
                                         )
LAKE OZARK FIRE DISTRICT, and            )
CHRIS MOORE,                             )
                                         )
            Defendants.                  )
                                         )

## ORDER

Before the Court is the Motion for Summary Judgment [Doc. # 34] filed by

Defendants Lake Ozark Fire District ("LOFD") and Chris Moore. For the following reasons,

the Court grants the motion in part and dismisses the state law claims without prejudice.

## I.    Background

### A.    Uncontroverted Facts[1]

Plaintiff Stefanie Smith ("Smith") was employed by Defendant LOFD from May 2005

until February 2009. Between September 2006 and the end of her employment, Defendant

Chris Moore was Smith's captain and immediate supervisor.

### 1.    Extension of Smith's Probationary Period

---

[1] The Court has considered the parties' statements of undisputed fact which are
supported by evidence. In considering this motion, the Court has drawn all inferences in favor of
the non-movant.

The standard probationary period for LOFD firefighters is one year. Plaintiff Smith completed one year of service in May 2006. Smith asked her supervisor at that time, Captain Bowling, about the end of her probation. Captain Bowling arranged a meeting between him, Smith and then-Chief Woodson at which Smith was informed that she had not completed all the necessary tasks to be taken off probation. Smith was given a probationary packet at the meeting listing all of the duties that a firefighter must complete in order to be taken off probation. Smith had not completed all of the items in the probationary packet. Chief Woodson signed Smith off as having completed several of the tasks at the meeting.

Smith did not receive the probationary packet in a timely manner. If she had received the packet in a timely manner, she might have completed it without an extension of her probation. No other employees have had their probation extended.

Plaintiff Smith continued to work on completing the required tasks so that she could be taken off probation. Defendant Moore requested that Smith be taken off probation on November 22, 2006. Smith received the pay increase to which she was entitled for completing probation retroactive to her May 2006 anniversary date.

### 2. Urination on Smith's Car

On August 26, 2006, two male employees of Defendant LOFD urinated on or near Plaintiff Smith's car in the parking lot of a local drinking establishment. Chief Amsinger and Chief Troy Negrete interviewed the individuals alleged to have been responsible. The two coworkers admitted to urinating outside near her vehicle but denied having urinated on her vehicle. The District's Board of Directors ultimately determined that they did not have

enough supporting evidence to discipline the employees. After the incident, Chief Amsinger spoke with all the shifts and informed them that such actions would not be tolerated, and that employees were to respect each other.

### 3.    Step-Up Captain Duty

The firefighters at LOFD are unionized, and Smith was a member of the union. A Memorandum of Understanding between Defendant LOFD and the union established a step-up policy, providing for the firefighter with the most seniority to temporarily serve as captain when the shift captain is absent from the station.

In November 2007, Plaintiff Smith was the most senior person available to serve as captain during Defendant Moore's planned absence. However, Jason Nelson, a white male, was selected to temporarily serve as step-up captain. Smith subsequently complained to Defendant Moore that she had been passed over as step-up captain. In response, Moore informed her that he did not believe that she was ready to serve as step-up captain. Smith agreed that she was not ready to serve as step-up captain in November 2007.

Smith also filed a grievance for being passed over as step-up captain. Smith was informed that the grievance committee had determined that her complaint was valid and that Defendant Moore would be counseled. Chief Amsinger counseled Moore. Moore responded that he believed that he should have discretion to deem an individual ineligible to be step-up captain for safety reasons.

One year later, in November 2008, Smith was again passed over as step-up captain in favor of Nelson. Smith felt she was more prepared at this time than the year before.

Defendant Moore knew that he was violating the step-up policy when he passed over Smith in November 2008.

Tim Gash had more seniority than Smith. Defendant Moore had previously offered the step-up position to Gash, but Gash turned it down. Moore states that he would not have allowed Gash to serve as step-up captain in November 2008 because he had learned that Gash was afraid of heights. Moore states that he made Gash climb the ladder every day after Gash disclosed that he was afraid of heights. Moore also made Smith climb the ladder every day after Smith told Moore that she was not comfortable climbing it.

Plaintiff Smith filed a complaint with Defendant Moore for failing to name her step-up captain. Moore told Smith that she was free to file a grievance but that he would have to tell the Board about the deficiencies that he believed prevented her from being qualified to serve as step-up captain. The male union shop steward advised Smith against filing a grievance, and Smith did not do so.

### 4. Smith's Coworker's Offensive Comment

On October 13, 2008, Plaintiff Smith was at the main station with the crew, some of whom were discussing a gun safety class and guns in general. Smith's co-worker Jason Nelson became angry about problems that he was having with Mexicans in his hometown and stated, "Well, all Mexicans out there should be shot." Firefighter Scott Apprill warned Nelson to stop, since Smith was of Mexican descent. After Apprill's comment, the conversation turned to small talk. Defendant Moore was present and had heard Nelson's comment but had not disciplined him.

Smith approached Moore a short time thereafter and told him that she was offended by Nelson's comment. Moore responded that he did not believe that the comment was directed at Smith or her family. Smith responded that it did not matter to whom the comment was directed because it created a hostile work environment for her. Moore stated that he would talk to Nelson. Later that same evening, Moore called Smith and told her that he wanted her to talk to Nelson. When Nelson got on the line, he apologized to Smith for his comment. Nelson did not make offensive comments to Smith again.

Plaintiff Smith submitted a written complaint about Nelson's comment and provided it to Defendant Moore. Smith met with Moore and Chief Birdsley on or about October 15, 2008, to discuss the incident. Smith does not remember specifically what was said at the meeting, but recalls that she was told that she needed to "let it go."

### 5. Disciplinary Measures against Smith

Plaintiff Smith was disciplined on three separate occasions between September 2008 and February 2009.

#### a. Untucked Shirt

On September 23, 2008, Smith received a verbal warning that her T-shirt was not tucked in. Defendant Moore had advised her to tuck in her T-shirt on at least one other occasion. Moore states that no other employees were disciplined for untucked shirts. There is no evidence that other employees' shirts were untucked on more than one occasion.

#### b. Halloween Emergency Call

Plaintiff Smith received another verbal warning on October 31, 2008.  Smith had been assigned to the fire engine that day.  Defendant Moore told Smith to have her gear at the truck and ready for emergency calls, although he also gave her permission to check the medications in the ambulance.  During the shift, Smith was checking the expiration dates on non-narcotic drugs stored in the ambulance.  The remaining members of the crew were clearing brush on district property but were not at the station.  An emergency call came in, and it took the crew clearing brush about two minutes to get to the station.

Because it was Halloween and Smith expected children at the fire station, she took heightened precautions to secure the medications to prevent children from having access to the pills.  The drugs were spread out on a bench and Smith ran inside to dispose of the expired medications when the emergency call came in.  The truck left to respond to the call without her.  Smith does not know of any other incident in which a firefighter who is present at the station when a call comes in has missed the truck, but Moore admits that others have missed calls.

When Defendant Moore spoke with Smith regarding the October 31, 2008 incident, the conversation became heated and she began to walk away, suggesting that they go their separate ways to cool off.  Moore found it disrespectful for a subordinate officer to walk away from a captain and gave her a verbal warning.

### c.    Events in Late 2008

On November 7, 2008, Plaintiff Smith submitted a request to Defendant Moore to meet in the presence of a neutral party.  The purpose of the request was to discuss the

continual disagreements between the two and to diffuse the negative sentiment. In response, Moore and Smith sat down with Chief Birdsley the same day. At the meeting, Moore and Birdsley told Smith that they knew that she was offended by Nelson's comment and the incident when her car was urinated on, but that she needed to move on.

Plaintiff Smith received a performance evaluation from Defendant Moore in December 2008. Moore felt that it was a good evaluation. Smith did not consider the evaluation to be a good one because she felt that she was ranked unfairly low in some categories. Smith did not agree with the comments regarding her cooperation, temperament, anger, self-pity, listening and comprehending. She believes that some of the ratings should have been higher, including in the categories of job knowledge, dependability and job productivity.

Smith admits that she had been late to work a few times. She also admits that she had not been signed off to operate all of the fire trucks by the end of 2008. However, Smith believed that she should have received more training.

### d. The MRSA Incident

In February 2009, Plaintiff Smith received a two-day suspension after she told Michelle Fuellemann, a volunteer at LOFD, that Smith's partner, Dave Matusik, may have Methicillin-resistant Staphylococcus Aureus ("MRSA"). Matusik had informed Smith and everyone else on her shift that he had a staph infection and that it was possibly MRSA. Moore admits that Matusik "had a contagious disease that could possible affect all of us and he wanted us to know about it." [Doc. # 45, Ex. 12 at 151.]

A January 28, 2009 letter to Plaintiff Smith from Defendant Moore claimed that Smith had committed "a category two offense, per our disciplinary policy." [Doc. # 35, Ex. 2, at 40.] The subject line of that letter was "Re: False/slanderous statement of a LOFD employee." *Id.* However, it is now uncontroverted that Matusik did have MRSA.

Smith had previously had MRSA. In light of this information, Smith asked Moore what she could do to cleanse and sanitize the ambulance and station. Moore told Smith that he would check with his superiors and let her know. Smith had not heard back from Moore by the next day, so she contacted Fuellemann and asked her what precautions she could take to avoid exposure to her partner's potential MRSA. Smith and Fuellemann are both licensed emergency medical technicians.

After Vince Loyd, the Division Chief of Emergency Medical Services ("EMS") at LOFD, discovered that Smith told Fuellemann about Matusik's possible MRSA – and that Fuellemann had then told her husband – Smith was summoned to Loyd's office with Moore and David Martin, the union shop steward. Smith did not agree that Matusik's medical information was a private matter that should not have been discussed with other personnel, since Smith thought that other personnel who might be exposed to the infection had a right to know about it.

Defendants state that Michelle Fuellemann was discharged from her duties as a result of the leak of Matusik's medical condition. Meanwhile, Smith was suspended for two days and the approval she had previously received to attend an out-of-state training for female firefighters was rescinded. Smith submitted a letter to Chief Amsinger and the District's

Board of Directors contesting her suspension, and she attached two documents that had been given to her by the hospital when she was treated for MRSA. Shortly after Smith's suspension, she received a written response from Defendant LOFD stating that because they had not heard from her they were putting her on medical leave. Smith admits that she was having a lot of headaches and was just not herself. She was on medical leave from February 12 through March 4, 2009. On or about February 24, 2009, Smith came into Chief Birdsley's office with her equipment and gear, handed him the business card of a lawyer, told him she was "done," and left. Smith did not intend to return to work at LOFD.

While Smith was suspended and Fuellemann was terminated after the MRSA incident, Vince Loyd was promoted to Division Chief of EMS, even though LOFD knew that he had been arrested for possession of illegal drugs. Nelson – who was never punished for his discriminatory comment about Mexicans – later used the LOFD credit card without permission and was allowed to resign rather than being terminated.

Chief Gary Woodson has admitted that he heard Smith's co-worker Ryan Vaughn say on more than one occasion that "we don't need women in the fire service." Additionally, Assistant Chief Tony Dudley provided the following deposition testimony in a previous case:

Q. Did you ever witness any female employee being harassed by Mr. Birdsley?

A. I've heard him make negative comments to a female named Ste[f]anie Smith.

Q. And what comment?

A. That women shouldn't be in this service.

[Doc. # 45, Ex. 6 at 2.]

### B.    Procedural History

Plaintiff Smith filed a charge of discrimination with the Equal Employment Opportunity Commission as well as with the Missouri Commission on Human Rights. Both agencies issued Smith a notice of suit rights.

Plaintiff's Complaint contains six separate counts. Count I is for gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Count II is for gender discrimination under the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat. § 213.010 et seq. Count III is for national origin discrimination under Title VII. Count IV is for national origin discrimination under the MHRA. Counts I through IV also include allegations of a hostile work environment. Count V is a claim for retaliation under Title VII. Count VI is a claim for retaliation under the MHRA. Plaintiff's claims under Title VII (Counts I, III, and V) are asserted against Defendant LOFD. Plaintiff's claims under the MHRA (Counts II, IV, and VI) are asserted against both Defendants Moore and LOFD.

## II.    Discussion

### A.    Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record] which it believes demonstrate the

absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the non-moving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a district court must look at the record and any inferences to be drawn from it in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248.

**B.** **Title VII**

**1.** **National Origin Discrimination**

Title VII prohibits an employer from discriminating against any individual with respect to compensation, terms, conditions, or privileges of employment because of national origin. 42 U.S.C. § 2000e-2(a)(1). Discrimination occurs when national origin "was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

To make a prima facie showing of national origin discrimination under Title VII, Plaintiff Smith must establish that: (1) she is a member of a protected class; (2) she met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated differently than similarly situated employees who were not members of the protected class. *Liu v. BASF Corp.*, 409 Fed.Appx. 988, 990-91 (8th Cir. 2011) (citing *Philip*

*v. Ford Motor Co.*, 413 F.3d 766, 768 (8th Cir. 2005)). A single "stray remark" by a non-decision maker, without more, is inadequate to raise an inference of discrimination. *See Girten v. McRentals, Inc.*, 337 F.3d 979, 983 (8th Cir. 2003) (single reference to plaintiffs' age by non-decision maker insufficient to raise an inference of discrimination); *Saulsberry v. St. Mary's Univ.*, 318 F.3d 862, 867 (8th Cir. 2003) (isolated racial comments made by non-decision makers did not support discrimination claim); *Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3d 1046, 1055 (8th Cir. 2007) (supervisor's inquiries as to whether plaintiff had a harem and rode camels in Egypt were no more than stray remarks).

Here, Plaintiff Smith alleges only that her co-worker Jason Nelson stated, "Well, all Mexicans out there should be shot." Firefighter Scott Apprill then warned Nelson to stop, and the conversation turned to small talk. That night, Defendant Moore had Nelson call Smith to apologize. Nelson did not make offensive comments to Smith again. Although Nelson was never officially disciplined for his offensive comment, there is no evidence that national origin discrimination played any role in the decision making of Defendant LOFD. Nelson's comment is better characterized as a stray remark that cannot give rise to an inference of discrimination.

For the reasons stated above, the Court grants Defendants' Motion for Summary Judgment with respect to Plaintiff's claim for national origin discrimination under Title VII.

### 2. Hostile Work Environment

To establish a hostile work environment claim under Title VII, Plaintiff Smith must show: (1) she is a member of a protected group; (2) she was subject to unwelcome

harassment; (3) the harassment was based on her protected status; and (4) the harassment affected a term, condition, or privilege of her employment. *Devin v. Schwan's Home Serv., Inc.*, 491 F.3d 778, 788 (8th Cir. 2007) (citing *Turner v. Gonzales*, 421 F.3d 688, 695 (8th Cir. 2005)). "Allegations of a few isolated or sporadic incidents will not suffice; rather, the plaintiff must demonstrate the alleged harassment was so intimidating, offensive, or hostile that it poisoned the work environment." *Id.* at 788 (internal quotations and citations omitted). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment . . . is beyond Title VII's purview." *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 934 (8th Cir. 2002) (internal quotations and citation omitted). "To clear the high threshold of actionable harm, [the plaintiff] has to show that the workplace is permeated with discriminatory intimidation, ridicule, and insult." *Id.*; *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (noting that while "a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work" violates Title VII, "not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment"). In making this determination, courts consider the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Bradley v. Widnall*, 232 F.3d 626, 631 (8th Cir. 2000) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

The Eighth Circuit has set a high bar for hostile work environment claims. In *Duncan*, for example, the Eighth Circuit found that the employer's actions "were boorish,

chauvinistic, and decidedly immature, but we cannot say they created an objectively hostile work environment permeated with sexual harassment." 300 F.3d at 935. In *Devin*, the Eighth Circuit held that the plaintiff presented no evidence of workplace conduct rising to the level of a hostile work environment:

> Even if we construe [plaintiff's superviser's] isolated comments as gender-based, they simply were not severe, pervasive or demeaning enough to have altered a term, condition, or privilege of her employment. As for her claims she was denied a Route Builder, was unfairly disciplined, was paid less than male [route managers], was not allowed to expense pay phone calls, and was required to make inventory changes on the computer, they, at best, amount to a frustrating work environment rather than an objectively hostile work environment.

491 F.3d at 788 (citations omitted). In *Bradley*, the plaintiff alleged that her supervisory duties were curtailed, that she was left out of the decision making process, treated with disrespect, and subjected to false complaints. 232 F.3d at 631. The Eighth Circuit concluded that although "the conduct cited by Bradley may have resulted in a frustrating work situation, we do not believe that it was so severe or pervasive as to have affected a term, condition, or privilege of her employment." *Id.* at 631-32.

Plaintiff Smith makes little effort to address this contrary caselaw, simply stating that these cases are "not analogous" and "off point" without explaining what makes her hostile work environment claims distinguishable. [Doc. # 45 at 44.] Plaintiff's reliance on treatises to explain that a "hostile environment is not limited to sexual advances or even to sexual behavior targeted at the complainant," *id.* at 45, is insufficient to overcome Eighth Circuit

caselaw requiring a showing of conduct so intimidating, offensive, or hostile that it poisoned the work environment. *Devin*, 491 F.3d at 788.

With respect to Plaintiff's Title VII hostile work environment claim, the instant case is indeed analogous to *Devin*. Plaintiff Smith has submitted some evidence of isolated discriminatory comments which could not be said to have been severe, pervasive or demeaning enough to have altered a term, condition, or privilege of her employment. Like the plaintiff in *Devin*, Smith has submitted some evidence that she was unfairly disciplined. Smith makes much of the fact that Defendant Moore made her climb the ladder every day to overcome her discomfort, but she has not rebutted Moore's claim that he made her white male co-worker Tim Gash climb the ladder every day as well, to overcome his own fear of heights. The remaining evidence of sporadic unfair discipline and discriminatory comments does not "clear the high threshold of actionable harm" for a hostile work environment claim. *Duncan v. Gen Motors Corp.*, 300 F.3d at 934. Therefore, the Court grants Defendants' Motion for Summary Judgment with respect to Plaintiff's Title VII hostile work environment claim.

### 3. Gender Discrimination and Retaliation Claims

Even though Plaintiff Smith has not submitted evidence of discrimination so severe or pervasive to rise to the level of a hostile work environment, she could still survive summary judgment with respect to her gender discrimination and retaliation claims under Title VII. A plaintiff alleging discrimination or retaliation under Title VII survives summary judgment either by presenting direct evidence or by creating an inference of discrimination

or retaliation under the *McDonnell Douglas* burden-shifting framework. *See Roberts v. Park Nicollet Health Servs*., 528 F.3d 1123, 1127 (8th Cir. 2008) (discrimination); *Tyler v. Univ. of Ark. Bd. of Trs*., 628 F.3d 980, 985 (8th Cir. 2011) (retaliation).

Because Plaintiff does not argue that she has direct evidence of discrimination or retaliation, the Court analyzes her Title VII claims under the traditional burden-shifting analysis of *McDonnell Douglas*. Under this framework, Plaintiff bears the initial burden of establishing a prima facie case. If a prima facie case is established, the burden of production then shifts to Defendant LOFD to articulate a legitimate, nondiscriminatory reason for its action. If the employer makes such a showing, Plaintiff must then demonstrate that the stated nondiscriminatory rationale was a mere pretext. *See Qamhiyah v. Iowa State Univ. of Sci. & Tech*., 566 F.3d 733, 746 (8th Cir. 2009).

Plaintiff Smith presents a litany of alleged instances of discrimination and retaliation, yet she makes no attempt to rebut Defendant's argument that it has stated legitimate, nondiscriminatory reasons for those specific actions, or to argue that such reasons were mere pretext. Instead, Plaintiff relies solely on the argument that those actions, in their totality, amounted to constructive discharge – and that discrimination or retaliation generally caused the constructive discharge.

If Plaintiff submits sufficient evidence to establish that she was constructively discharged, she will have established the adverse employment action necessary to make her prima facie case of both gender discrimination and retaliation. First, to establish a prima facie case of discrimination under Title VII, Plaintiff must show: (1) she is a member of a

protected class; (2) she was qualified to perform the job; (3) she suffered an adverse employment action; and (4) the circumstances permit an inference of discrimination. *Lewis v. Heartland Inns of America, LLC*, 591 F.3d 1033, 1038 (8th Cir. 2010). In the discrimination context, an adverse employment action must produce a material employment disadvantage, *Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1016 (8th Cir. 1999), and may include constructive discharge. *Fercello v. County of Ramsey*, 612 F.3d 1069, 1083 (8th Cir. 2010). Here, Plaintiff argues that "numerous events when considered in totality indicate an intolerable work environment substantial to show constructive discharge." [Doc. # 45 at 35.]

Similarly, to establish a prima facie case of retaliation under Title VII, Plaintiff must show that: "(1) [she] engaged in protected conduct; (2) reasonable employees would have found the challenged retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct." *Recio v. Creighton Univ.*, 521 F.3d 934, 938-39 (8th Cir. 2008) (quoting *Brenneman v. Famous Dave's of Am., Inc.*, 507 F.3d 1139, 1146 (8th Cir. 2007)). "[R]etaliatory actions must be material, producing significant rather than trivial harm." *Devin*, 491 F.3d at 786. When the employer's actions are considered cumulatively, as Plaintiff urges, "where an employer engages in extreme, systemic retaliatory conduct resulting in serious employment consequences," such a pattern of conduct can qualify as sufficiently adverse. *Id.* at 788. To establish her prima facie case of Title VII retaliation, Plaintiff argues only: "There is a causal nexus between Plaintiff's complaints and her constructive discharge." [Doc. # 45 at 56.]

In other words, Plaintiff has presented her case in such a way that her Title VII gender discrimination and retaliation claims hinge entirely on her constructive discharge argument. "The bar to relief, however, is high" for constructive discharge. *Fercello*, 612 F.3d at 1083 (citing *O'Brien v. Dep't of Ag.*, 532 F.3d 805, 810-11 (8th Cir. 2008)); *see also Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) (stating that conditions must be "sufficiently extraordinary and egregious" in order to establish constructive discharge (quotation omitted)). "Constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable, thereby forcing her to quit." *Devin*, 491 F.3d at 789 (quoting *Baker v. John Morrell & Co.*, 382 F.3d 816, 829 (8th Cir. 2004)). Similar to a hostile work environment claim, to rise to the level of constructive discharge, the employer's conduct "must have been severe or pervasive enough to create an objectively hostile or abusive work environment and additionally the plaintiff must subjectively perceive the environment to be abusive." *Id.* (quoting *Johnson v. Runyon*, 137 F.3d 1081, 1083 (8th Cir.1998)).

*Devin*'s constructive discharge analysis mirrored its hostile work environment analysis:

> The conduct she alleges is simply neither severe nor pervasive enough to support her claim. . . . . [Her supervisor's] "gender-related" comments were sporadic and were not particularly demeaning or abusive. Likewise, we have held feelings of being unfairly disciplined or criticized are insufficient to support a claim of constructive discharge.

*Id.* at 790 (citations omitted).

Here too, the conduct alleged by Plaintiff Smith is neither severe nor pervasive enough to rise to the level of an intolerable workplace. On or about February 24, 2009, Smith came into Chief Birdsley's office with her equipment and gear, handed him the business card of a lawyer, told him she was "done," and left. Smith did not intend to return to work at LOFD. That decision followed her two-day suspension for revealing to LOFD volunteer Michelle Fuellemann that Smith's partner may have had MRSA. Over the years she worked at LOFD, Smith had also endured frustrations such as being passed up twice to temporarily serve as step-up captain; the temporary extension of her probation period (for which she was ultimately compensated); being disciplined for an untucked shirt and for missing an emergency call (and then walking away from her supervisor); and witnessing a lack of discipline in response to Nelson's comment about Mexicans and the urination on her car at a local bar. There is also some evidence of sporadic gender-related comments at the LOFD.

As explained above, these frustrations experienced over the course of more than three years of work were neither severe nor pervasive. As in *Devin*, the gender-related comments were sporadic, and mere unfair discipline or criticism is insufficient to rise to the high bar for constructive discharge.

Because Plaintiff has developed no other argument to show that she suffered an adverse employment action, she has failed to establish her prima facie case for gender discrimination or retaliation. Presumably, Plaintiff relies solely on her constructive discharge theory because she has been unable to cite specific evidence that either (1) a sufficiently

similarly-situated co-worker was treated more favorably, in order to raise an inference of discrimination or retaliation; or (2) Defendant's stated reasons for its actions were pretextual. For example, with respect to its decision to suspend Plaintiff for two days in February 2009, Defendant LOFD states the legitimate, non-discriminatory reason that Plaintiff was a source of the leak of her partner's medical information. Beyond her broad claims for constructive discharge, Plaintiff has not pointed to specific evidence of pretext. Nor has she identified a similarly situated co-worker treated more favorably. *See Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 996 (8th Cir. 2011) (plaintiff "failed to come forward with evidence of any remotely similarly-situated employee who was accused of remotely-comparable conduct" and not similarly disciplined).

For the reasons stated above, the Court grants Defendants' Motion for Summary Judgment with respect to Plaintiff Smith's Title VII claims.

## C.    MHRA

The Supreme Court of Missouri has stated that the MHRA's "safeguards are not identical to the federal standards and can offer greater discrimination protection." *Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 818-19 (Mo. 2007) (en banc). For example, *Dougherty* noted that the MHRA defines "discrimination" to include "*any* unfair treatment based on . . . sex . . . as it relates to employment." *Id.* at 819 (quoting Mo. Rev. Stat. § 213.010(5)).

"In most cases, when federal and state claims are joined and the federal claims are dismissed on a motion for summary judgment, the pendent state claims are dismissed without

prejudice to avoid needless decisions of state law." *Ivy v. Kimbrough*, 115 F.3d 550, 552-53 (8th Cir. 1997) (internal quotation marks and citation omitted); *see also* 28 U.S.C. § 1367(c)(3) (court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it had original jurisdiction). To avoid needless decisions of state law in this case, the Court dismisses Plaintiff Smith's MHRA claim without prejudice, so that it may be decided by the courts of Missouri. *See Wierman*, 638 F.3d at 1003.

## III. Conclusion

Accordingly, it is hereby ORDERED that Defendants' Motion for Summary Judgment [Doc. # 34] is GRANTED with respect to Plaintiff Smith's Title VII claims, and Plaintiff's MHRA claims are dismissed without prejudice.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  June 13, 2011
Jefferson City, Missouri